UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LESLIE GREEN,                        )
                                     )
            Plaintiff,               )
                                     )
    v.                               )    No. 4:17 CV 2335 JMB
                                     )
                                     )
NANCY A. BERRYHILL,                  )
Deputy Commissioner of Operations,   )
Social Security Administration,      )
                                     )
            Defendant.               )

**MEMORANDUM AND ORDER**[1]

Plaintiff Leslie Green ("Plaintiff") appeals the decision of the Deputy Commissioner of

Operations, Social Security Administration ("Defendant"), denying her application for disability

benefits under Title II of the Social Security Act, <u>see</u> 42 U.S.C. §§ 401 <u>et</u> <u>seq.</u> Substantial

evidence supports the Commissioner's decision, and therefore it is affirmed. <u>See</u> 42 U.S.C. §

405(g).

I.       **Procedural History & Summary of Memorandum Decision**

On April 18, 2014, Plaintiff filed an application for disability benefits, arguing that her

disability began on August 31, 2011, as a result of left knee surgeries, diabetes, high blood

pressure, high cholesterol, obesity, and hearing problems. (Tr. 86, 146) On September 8, 2014,

Plaintiff's claims were denied upon initial consideration. (Tr. 86-90) Plaintiff then requested a

hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at the hearing (with

counsel) on May 3, 2016, and testified concerning the nature of her disability, her functional

---

[1] This case is before the undersigned for judicial review pursuant to 42 U.S.C. § 405(g), with the
consent of the parties under 28 U.S.C. § 636(c).

limitations, and her past work.  (Tr. 52-75)  A vocational expert ("VE") testified about the nature

of Plaintiff's past work, and opined as to Plaintiff's ability to perform her past relevant work,

based upon her functional limitations, age, and education..  (Tr. 56-75)  After taking Plaintiff's

testimony, considering the VE's testimony and the results of a consultative examination, and

after reviewing the rest of the evidence of record, the ALJ issued a decision on June 28, 2016,

finding that Plaintiff was not disabled, and therefore denied benefits.  (Tr. 29-40)

        Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social

Security Administration.  (Tr. 1-5)  On July 30, 2017, the Appeals Council denied review (Tr. 1-

3), thereby making the June 2016 decision of the ALJ the final decision of the Commissioner.

Plaintiff has exhausted her administrative remedies, and her appeal is properly before this Court.

See 42 U.S.C. § 405(g).

        In her brief to this Court, Plaintiff argued that "[t]he decision of the [ALJ] failed to

properly consider Plaintiff's subjective complaints of pain, and the consistent observations of

third parties regarding Plaintiff's limitation in error under the standards contained in Polaski, …,

and as a result, failed to properly consider Plaintiff's residual functional capacity, and as a result

of this error erred in finding Plaintiff would be capable of her past relevant work."  (ECF No, 15,

Pltf's Brief at 5)  The undersigned construes Plaintiff to be asserting the following arguments:

(1) the ALJ failed to properly weigh the medical opinion evidence; (2) the ALJ failed in

weighing Plaintiff's subjective complaints of pain; (3) the ALJ erred in discounting third-party

statements; and (4) the ALJ erred in formulating the RFC.  The Commissioner filed a detailed

brief in opposition.  As explained below, the Court concludes that substantial evidence supported

the ALJ's decision.

## II.     <u>Third Party Statements</u> (Tr. 225-28)

The administrative record before this Court includes four third-party letters, one from Plaintiff's husband, one from her daughter, one from a friend, and one from a former coworker. (Tr. 225-28, 231)

Perry Owens, Sr., Plaintiff's husband, stated that he has to assist Plaintiff "all the time," including helping her get out of chairs and assisting her with walking.  (Tr. 226)  Plaintiff's daughter, Kasia Coleman, stated that Plaintiff is "totally dependent on the help of family members for day to day activities[,]" including helping her get out of chairs and with daily mobility.  (Tr. 227)

Plaintiff's friend Jacqueline Waller indicated that Plaintiff "severely suffer[s] from knee problems," and Plaintiff struggles to stand from a sitting position.  (Tr. 231)  Ms. Waller further stated that Plaintiff struggles to walk up the small incline on her driveway and needs to hold onto someone or something to step up.  (<u>Id.</u>)

Plaintiff's former coworker Mary Usher stated that she witnessed Plaintiff fall on a wet floor at their mutual place of employment in December 2008.  (Tr. 225)  Ms. Usher opined that since that fall, Plaintiff needs assistance getting into and out of cars and out of chairs. (<u>Id.</u>)

## III.     <u>Function Report – Adult</u> (Tr. 188-98)

In her Function Report – Adult, completed on July 17, 2014, Plaintiff asserted that her impairments limit her abilities to stand, walk, lift, squat, reach, kneel, climb stairs, and hear. Plaintiff claimed that she tries not to walk alone due to her fear of falling and she cannot get up from a seated positon without assistance.  Plaintiff reported that she needs assistance dressing and uses a cane and knee braces for ambulation as prescribed by a physician.

IV.    **Medical Records**

The administrative record before this Court includes medical records indicating that Dr. Khan is Plaintiff's primary care physician. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

A.    **Christian Hospital Northeast Emergency Room** (Tr. 241-76)

On July 29, 2012, and December 27, 2013, Plaintiff received treatment in the emergency room at Christian Hospital Northeast.

On July 29, 2012, Plaintiff presented in the emergency room complaining of a generalized headache, high blood pressure, and a racing heart. Plaintiff admitted eating several cookies before going to bed. Examination showed Plaintiff had normal range of motion in all four extremities. Treatment included being given insulin.

On December 27, 2013, Plaintiff presented in the emergency room reporting an adverse reaction to Vicodin ingested for her pain. Plaintiff's diagnosis included abdominal pain and unspecified systemic agent causing adverse effects in therapeutic use. The nurse observed that Plaintiff ambulated without assistance to a private vehicle at discharge.

B.    **American Pain Management – Dr. Hafiz Khattak** (Tr. 294-312, 437-505)

Between December 26, 2013, through April 12, 2016, Dr. Khattak treated Plaintiff's chronic bilateral knee and low back pain.

On December 26, 2013, Dr. Khattak observed Plaintiff had normal gait, station, and stability. Dr. Khattak prescribed hydrocodone and advised Plaintiff not to get pain medication from multiple doctors as this is a violation of the narcotic agreement. In follow-up treatment on January 28, 2014, Dr. Khattak discontinued hydrocodone and prescribed roxicodone and ordered

aquatic physical therapy.  On February 11, 2014, Plaintiff reported that roxicodone helped with pain relief.  Dr. Khattak observed Plaintiff had normal gait, station, and stability.  Dr. Khattak administered a hyalgan injection.  In follow-up treatment on February 18, 20, and 25, 2014, Plaintiff reported she could tell a difference in her knee pain after the injections.  Dr. Khattak again administered a hyalgan injection.

On March 4, 2014, Plaintiff returned for a hyalgan injection and reported improvement in her pain.  Dr. Khattak observed Plaintiff had normal gait, station, and stability.  Dr. Khattak administered a hyalgan injection.  In follow-up treatment on March 6, 11, and 25, 2014, Plaintiff reported the injections had reduced her pain and helped her mobility.  Dr. Khattak administered another hyalgan injection.

On April 29, 2014, Plaintiff returned for a medication refill of roxicodone and requested a hyalgan injection.  Dr. Khattak noted that the prescribed medication was controlling Plaintiff's pain well.  In follow-up treatment on June 12, 2014, Dr. Khattak observed Plaintiff had normal gait, station, and stability and refilled Plaintiff's roxicodone prescription.  On July 3 and 31, 2014, Plaintiff received a medication refill of roxicodone and reported managing her pain with medications.

In follow-up treatment on September 2, 2014, Plaintiff reported roxicodone continued to provide pain relief.  Dr. Khattak observed Plaintiff had normal gait, station, and stability and refilled Plaintiff's roxicodone prescription.  Plaintiff reported her medication regimen continued to work well at relieving her pain, and Plaintiff requested refills.  Dr. Khattak observed Plaintiff had normal gait, station, muscle strength, and stability.  Dr. Khattak noted that Plaintiff did not report any complications of her diabetes mellitus.

On October 2 and 30, 2014, Dr. Khattak observed Plaintiff had normal gait, station, and

muscle strength, refilled her medications, finding that the medications were controlling her pain well, and encouraged Plaintiff to increase her physical activity. In follow-up treatment on November 25 and December 23, 2014, and January 27, 2015, Dr. Khattak refilled Plaintiff's medication regimen, noting that the regimen was controlling her pain. On February 24, 2015, Plaintiff reported exercising in a pool once a week, and the medication regimen was controlling her pain.

On April 7 and 16, 2015, Dr. Khattak administered hyalgan injections. In follow-up treatment on April 21, 2015, Plaintiff reported moving better after the injections. Dr. Khattak administered a hyalgan injection. On May 5 and April 28, 2015, Dr. Khattak administered hyalgan injections. Dr. Khattak observed Plaintiff had antalgic gait and station, and normal muscle strength and stability. On May 14, 2015, Dr. Khattak administered a hyalgan injection and refilled Plaintiff's medication regimen. In follow-up treatment on May 26, 2015, Dr. Khattak administered a hyalgan injection and observed Plaintiff had antalgic gait and station, and normal muscle strength, and stability. On June 2, 2015, Plaintiff reported her pain at an 8/10 level despite pain medication and exercising three times a week. Plaintiff indicated improvement in pain since starting hyalgan injections, and Dr. Khattak administered a hyalgan injection. During treatment on June 9, 2015, Plaintiff reported her pain at a 7/10 level without pain medication. Dr. Khattak observed Plaintiff had antalgic gait and station, and normal stability and muscle strength. On July 7, 2015, Plaintiff reported her pain at a 4/10 level with pain medication and increased pain in her arms after her work out. Dr. Khattak administered a hyalgan injection.

In follow-up treatment on August 11, 2015, Plaintiff reported improved knee pain since her last injection, with her pain at a 5/10 level with pain medication. Dr. Khattak refilled Plaintiff's medication regimen. On September 8 and October 8, 2015, Plaintiff reported

experiencing difficulty in getting up from a seated position. Dr. Khattak refilled Plaintiff's medication regimen and found that the regimen was controlling Plaintiff's pain well. In follow-up treatment on November 5, 2015, Plaintiff reported her pain at a 3/10 level, but on December 3, 2015, Plaintiff reported her pain at a 7/10 level. Dr. Khattak refilled Plaintiff's medication regimen. On December 24, 2015, Plaintiff reported her pain at 4/10 level with pain medication and that her prescribed medication regimen continued to relieve her pain.

On January 5 and February 2, 2016, Dr. Khattak refilled Plaintiff's medications. On February 23, 2016, Dr. Khattak administered a hyalgan injection. In follow-up treatment on March 1, 8, 15, and 22, 2016, Plaintiff reported her pain at a 3/10 level with use of pain medication and hyalgan injections providing relief. Dr. Khattak administered hyalgan injections. On April 5, 2016, Plaintiff reported having urinary frequency for a week. Dr. Khattak administered a hyalgan injection. On April 12, 2016, Plaintiff reported relief from the injections. Dr. Khattak observed Plaintiff had antalgic gait and station and normal muscle strength.

**C.** **Gateway Healthcare - Dr. Mahrukh Khan** (Tr. 314-93)

On January 20, 2012, through March 14, 2016, Dr. Mahrukh Khan treated Plaintiff's diabetes, hypertension, and morbid obesity.

On January 20, 2012, Plaintiff reported not being compliant with her diabetic diet, and she was taking medications without difficulty. Dr. Khan directed Plaintiff to comply with a low salt diabetic diet and adjusted her medication regimen. In follow-up treatment on March 7, 2012, Dr. Khan recommended that Plaintiff lose weight and exercise. On March 21, 2012, Plaintiff reported trying to watch her diet and to increase her activities. Dr. Khan recommended that Plaintiff perform weight loss exercises and follow a diabetic diet. When Plaintiff returned on April 25, 2012, she reported having lost eight pounds.

In follow-up treatment on July 2, 2012, Dr. Khan urged Plaintiff to continue her weight loss exercises and medication regimen. On August 6, 2012, Plaintiff reported having been treated in the emergency room after eating twenty cookies and being under stress after opening a new business. In a follow-up visit on September 7, 2012, Plaintiff reported eating a Twinkie that caused her sugars and blood pressure to be elevated. Dr. Khan discussed compliance, avoidance of simple sugars, and daily exercise. Plaintiff reported that she had been walking in the mornings. On October 13, 2012, Plaintiff reported eating sweets and having five cookies for breakfast. In follow-up treatment on November 3 and December 3, 2012, Dr. Khan urged Plaintiff to comply with her diabetic diet. In follow-up treatment on February 15 and April 24, 2013, Dr. Khan reminded Plaintiff about medication compliance and exercising as tolerated. On May 20, 2013, Plaintiff reported eating a taco for breakfast. In follow-up treatment on July 1 and 12, 2013, Dr. Khan noted that Plaintiff's diabetes was poorly controlled due to her poor compliance with diet, her hypertension and hyperlipidemia were both controlled, and encouraged Plaintiff to lose weight and exercise.

On September 9, 2013, Plaintiff reported being upset with her weight gain and that she was snacking before bed by eating cookies and other sweets. In follow-up treatment on October 7, 2013, Plaintiff reported having knee pain for a week. Dr. Khan updated Plaintiff's medication regimen and administered a left knee intraarticular injection. Plaintiff returned on December 2, 2013, and Dr. Khan updated her medication regimen.

On January 4 and February 5, 2014, Dr. Khan recommended Plaintiff exercise as tolerated. In follow-up treatment on March 5, April 4, and May 5, 2014, Dr. Khan updated Plaintiff's medication regimen and urged Plaintiff to diet and exercise. In follow-up treatment, Dr. Khan attributed Plaintiff's high sugar reading to Plaintiff eating a cookie but noted that

otherwise Plaintiff was compliant.  Plaintiff returned on May 31, 2014, complaining of anxiety, chest tightness, and palpitations after completing seventy pull forwards with an exercise machine without taking her medications.  In follow-up treatment on August 8, 2014, Plaintiff reported being under a lot of stress, and Dr. Khan encouraged Plaintiff to continue her diabetic diet.

On October 13, 2014, Dr. Khan reviewed Plaintiff's medications and recommended Plaintiff continue her diabetic diet and exercise.

On January 12 and February 18, 2015, Plaintiff returned for follow-up treatment and medication refills.  During treatment on April 13, 2015, Dr. Khan found that Plaintiff's diabetes, hypertension, and hyperlipidemia were off target.  On May 18, 2015, Dr. Khan continued her medication regimen. On June 1, 2015, Dr. Khan increased Plaintiff's insulin dose.  In follow-up treatment on July 3, 2015, Plaintiff reported having bilateral knee pain and taking pain medication prescribed by her pain doctor and receiving injections.  On August 10 and September 4, 2015, Dr. Khan continued Plaintiff's medication regimen.

In follow-up treatment on October 7 and November 11, 2015, Dr. Kahn recommended that Plaintiff comply with the diabetic diet.  On January 13 and February 15, 2016, Dr. Khan treated Plaintiff and continued her diabetic diet and medications.

On March 14, 2016, Plaintiff reported that she planned to lose weight via surgical intervention.

**D.**      **SSM Health St. Mary's Hospital, St. Louis** (Tr. 395-424)

On February 9 and April 26, 2013, and October 16, 2014, Plaintiff received treatment in the emergency room at SSM Health St. Mary's Hospital.

On February 9, 2013, Plaintiff presented complaining that her blood sugars have been running in the 300 range.  A musculoskeletal examination was negative for back pain and normal

range of motion.

On April 26, 2013, Plaintiff was admitted to the hospital for evaluated hemoglobin and to rule out myocardial ischemia. The emergency room doctor noted that Plaintiff was "well known to me with a history of diabetes mellitus, type 2, poorly controlled, multifactorial due to stresses and social factors…." (Tr. 422) Plaintiff received a diabetic consultation and was educated on diabetic diet, low-cholesterol, and a heart healthy diet and was started on insulin therapy due to her elevated hemoglobin.

On October 16, 2014, Plaintiff sought treatment for chest pain. Physical examination showed a steady gait. A musculoskeletal examination showed a normal range of motion and no tenderness exhibited.

**E.** **Midwest Health Professional, P.C. – Dr. Tshiswaka Kayembe** (Tr. 425-36)

From September 10, 2014, through February 4, 2016, Dr. Tshiswaka Kayembe treated Plaintiff's hypertension.

On September 10, 2014, Dr. Kayembe evaluated Plaintiff and found her hypertension was uncontrolled. Dr. Kayembe also found Plaintiff had diabetes mellitus, obstructive sleep apnea, and morbid obesity. Dr. Kayembe added atenolol to Plaintiff's medication regimen. In follow-up treatment on September 24, 2014, Dr. Kayembe noted Plaintiff's blood pressure was better controlled, and Plaintiff reported feeling much better. Plaintiff returned on January 28, 2015. Dr. Kayembe found Plaintiff's hypertension was better controlled, but on that day her hypertension was high due to stress and continued Plaintiff's medication regimen. In follow-up treatment on February 4, 2016, Dr. Kayembe noted that Plaintiff had gained weight and appeared to be under a lot of stress stemming from the passing of her son and a number of family issues. Plaintiff reported recently eating chips and dip. Dr. Kayembe encouraged Plaintiff to follow a

low-salt diet and not drink any soda.

**F.**     **Medical Office of Dr. Zachary Newland** (Tr. 506-10)

On July 13 and October 30, 2015, and February 12 and April 18, 2016, Dr. Zachary

Newland provided diabetic foot care. Dr. Newland found evidence of peripheral diabetic

neuropathy as demonstrated by decreased vibratory sensations of both her feet. Plaintiff

reported that her blood sugars and blood pressure were doing well.

**G.**     **Consultative Examination – Dr. Dennis Velez** (Tr. 282-88, 291-92)

On August 16, 2014, Dr. Dennis Velez conducted a consultative examination of Plaintiff

for allegations of left knee pain, diabetes mellitus, hypertension, hypercholesterolemia, obesity,

and hearing difficulties.

Plaintiff reported having difficulty controlling her blood glucose but once Plaintiff started

taking insulin, her blood glucose reading dropped. Plaintiff reported having four episodes of

hypoglycemia each month. Plaintiff reported having hearing difficulties starting in 2002.

Plaintiff reported a history of knee pain since 2009 and having surgery. Plaintiff explained that

for the last two years, she has had a recurrence of pain and difficulty going up and down stairs

and getting up and down from a chair, lifting, and standing for prolonged periods of time.

Plaintiff reported using a cane to ambulate for a year.

Plaintiff reported that her typical day consists of watching television, washing dishes,

bathing, and reading. Dr. Velez observed Plaintiff had a limping gait but a normal stance, she

had slight difficulty getting up and down from a chair and the examination table, and she used a

cane. Musculoskeletal examination showed no limitation of range of motion and normal lower

extremity strength and sensation, but she had difficulty with heel and toe walking and lumbar

flexion. Plaintiff refused to do flexion-extension range of motion testing because she feared that

she would fall.  Dr. Velez noted that Plaintiff's axial spine had no deformity, and straight-leg raise testing was negative bilaterally.  Dr. Velez noted that Plaintiff's knees showed no evidence of instability and no limitation on range of motion and stability.

Based on his examination, Dr. Velez opined that Plaintiff's hypertension and hypercholesterolemia appeared to be controlled medically in the outpatient setting and no adverse side effects from medications.  Dr. Velez also opined that Plaintiff "would not have any limitations with regards to sitting, standing or walking although she may have difficulties keeping up pace if asked to walk for more than two thirds at the time due to possibility of arthralgia affecting her left knee." (Tr. 287)  Dr. Velez further opined that Plaintiff may have difficulty squatting but she had no manipulative limitations.

## V.     **The Hearing Before the ALJ**

The ALJ conducted a hearing on May 3, 2016.  Both Plaintiff and a VE Testified, and both were questioned by the ALJ and Plaintiff's attorney.  At the outset of the hearing, Plaintiff's counsel noted no objections to the proposed exhibits.

### A.     **Plaintiff's Testimony**

Plaintiff began her testimony by discussing her ability to function on a typical day.  (Tr. 60)  Plaintiff testified that she experiences pain in her knees and back when she tries to stand, and she requires assistance when she makes a transfer from sitting to standing.  (Tr. 60-61)  Plaintiff testified that since 2011, she spends 85% of the day in bed.  (Tr. 62)

Plaintiff returned to work for one month after her hysterectomy but then she stopped working because her wound was not healing.  (Tr. 62-63)

Plaintiff testified that Dr. Khan is her primary care doctor, and only doctor until she started treatment with a pain management doctor and a cardiologist.  (Tr. 64)  Plaintiff testified

that no doctor has recommended back surgery or additional knee surgery. (Tr. 68)

The ALJ observed that when Plaintiff walked into the hearing room, she did not appear to be using a cane or crutch. (Tr. 61) Plaintiff explained that she uses her husband as a crutch, and she needs help getting up and down from a seated position. (Id.)

Plaintiff testified that she has incontinence. (Tr. 65) Plaintiff has tried hyalgan injections as pain relief for her knees with some success but no long-term relief. (Tr. 66) Plaintiff testified that Dr. Khattak prescribed oxycontin two years earlier, and she experienced pain relief. (Tr. 66-67)

Plaintiff testified that she can sit for a couple of hours but then she has to lay down with a heating pad to alleviate her back pain. (Tr. 67) Plaintiff indicated that she can stand for less than a minute due imbalance, and she can walk with assistance for less than three minutes. (Tr. 68-69) Plaintiff can drive a car. (Tr. 67)

**B.      The VE's Testimony**

A VE testified regarding Plaintiff's past work and Plaintiff's current ability to work. The VE testified that Plaintiff had a very good work history as a patient resource and reimbursement agent as performed by Plaintiff, and as a caseworker, all skilled and sedentary jobs. (Tr. 71-72)

The ALJ asked the VE a series of hypothetical questions to determine whether someone with Plaintiff's age, education, work experience, and specific functional limitations would be able to find a job in the local or national economy. (Tr. 72-73) The VE responded that such a hypothetical person would be able to perform the job duties of a patient resource and reimbursement agent, and as a caseworker. (Tr. 73) The ALJ next asked whether a need to be off task 20% of the workday would erode the individual's ability to perform the past jobs. The VE advised that the lag in productivity for 20% of the day would preclude employment. (Tr. 74)

**VI**.    **The ALJ's Decision**

In a decision dated June 28, 2016, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 19-40)  Consistent with the VE's testimony, the ALJ found that Plaintiff had the residual functional capacity to perform the requirements her past relevant work.  (Tr. 39)  The ALJ opined that "[t]hese jobs fall within the parameters of the claimant's residual functional capacity, which is for performing less than the full range of sedentary work with additional exertional and postural restrictions…."  (Tr. 40)

In arriving at her decision, the ALJ followed the required five-step inquiry.  The ALJ found that Plaintiff has not engaged in substantial gainful activity since August 31, 2011, the alleged date of disability.  (Tr. 21)  The ALJ determined that Plaintiff had the severe impairments of degenerative joint disease of the bilateral knees, status post arthroscopic surgery of the left knee, degenerative changes of the thoracic spine and lumbago, type II diabetes mellitus with peripheral neuropathy, hypertension, mild cardiomegaly, asthma, obstructive sleep apnea, and obesity.  (Tr. 22)  The ALJ further determined that, despite her impairments, Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations/restrictions: (1) Plaintiff "can lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently;" (2) Plaintiff "can sit for six hours in an eight-hour workday;" (3) Plaintiff "can stand or walk for two hours total in an eight-hour workday, but for only 15 minutes at any one time;" (4) Plaintiff "can never climb ladders, ropes, or scaffolds;" and (5) Plaintiff "can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs."  (Tr. 29)

The ALJ supported her RFC determination with a thorough analysis of the record evidence.  (Tr. 29-39)  The ALJ considered the additional and cumulative effects of Plaintiff's

obesity and other impairments and the resultant functional limitations. (Tr. 29) The ALJ also considered Plaintiff's degenerative joint disease of the bilateral knees, her back impairment, type II diabetes mellitus, diabetic peripheral neuropathy, hypertension, asthma, and obstructive sleep apnea. (Tr. 29-34)[2]

The ALJ next considered Plaintiff's subjective complaints regarding her symptoms and limitations, but found her complaints not fully consistent with the evidence of record. (Tr. 37-39) The ALJ found that "[o]verall, the objective medical evidence is not fully consistent with the degree of symptoms and limitations alleged by [Plaintiff], and therefore her allegations and testimony are not fully consistent with the evidence." (Tr. 37) Next, the ALJ found that Plaintiff's "fairly conservative and beneficial treatment history also suggests that her impairments are not as severe and limiting as she alleges." (Id.) In particular, the ALJ noted that Plaintiff has been on the same medications for pain management since 2014 and has repeatedly reported improvement. (Tr. 38) The ALJ noted that although Plaintiff reported that she is required to use a cane on a daily basis and had a fear of falling down, her treatment notes do not reflect that she was observed using an assistance device at her doctor appointments or emergency room visits or reporting a fear of falling. As to her alleged need to spend 85% of her day in bed and urinary incontinence, the ALJ noted that Plaintiff never reported this degree of incontinence to any of her treating doctors. (Id.) The ALJ further noted that Plaintiff's presentation by using a cane and reporting a fear of falling, multiple episodes of symptomatic hypoglycemia each month, and impaired hearing during the consultative examination, were not entirely consistent with the objective medical evidence. (Tr. 38-39) Finally, the ALJ observed the evidence of record is not entirely consistent with Plaintiff's allegations of inability to work since August 31,

---

[2] The ALJ also found Plaintiff to have several non-severe impairments. Plaintiff does not challenge that aspect of the ALJ's decision.

2011, because many of Plaintiff's alleged disabling impairments, (e.g., diabetes, hypertension, hyperlipidemia, obesity, and left knee condition), preceded her alleged date of disability, and the medical record does not show that her impairments had worsened.

After examining the medical evidence, the ALJ accorded Dr. Velez's opinions great weight inasmuch as his opinions were "generally consistent with his own objective findings on examination, including normal bilateral knee range of motion and stability, normal lower extremity strength and sensation, and limping gait but normal stance" and "generally comports with the other medical evidence of record." (Tr. 34)

The ALJ concluded that Plaintiff could return to her past relevant work in a composite job as a patient resource and reimbursement agent and as a case worker. (Tr. 39) In making her determinations, the ALJ relied on testimony of the VE. Accordingly, the ALJ concluded that Plaintiff was not under a disability under the Act. (Tr. 40)

The ALJ's decision is discussed further below in the context of the issues Plaintiff has raised in this matter.

**VII.    Standard of Review and Legal Framework**

"To be eligible for SSI benefits, [Plaintiff] must prove that she is disabled ...." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A plaintiff will be found to have a disability "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable

to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district

court must "also take into account whatever in the record fairly detracts from that decision." Id.

Specifically, in reviewing the Commissioner's decision, a district court is required to examine

the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation

omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the

available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549,

556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing

court might have reached a different conclusion had it been the finder of fact in the first instance.

Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if

substantial evidence supports the Commissioner's decision, the court "may not reverse, even if

inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a

different outcome").

**VIII.  Analysis of Issues Presented**

Plaintiff nominally raises a single issue in her brief – that the ALJ failed to properly

consider her subjective complaints, and as a result, failed to properly assess her RFC, leading to

an erroneous conclusion that she could return to her past work. A full consideration of Plaintiff's

argument, however, requires the Court to address four distinct issues, namely:  (1) the ALJ failed

to properly weigh the medical opinion evidence; (2) the ALJ failed in weighing her subjective

complaints of pain; (3) the ALJ erred in formulating the RFC; and (4) the ALJ erred in discounting third-party statements. The Court addresses each of Plaintiff's proffered issues below.

### A.     <u>Weight Given to Medical-Opinion Evidence</u>

Plaintiff argues that the ALJ erred by giving great weight to the medical opinion evidence of Dr. Dennis Velez, a consultative examiner.

The ALJ explained that she afforded great weight to most of Dr. Velez's consultative report, finding that "[h]is opinion is generally consistent with his own objective findings on examination" and "comports with the other medical evidence of record." (Tr. 34) Dr. Velez's examination showed that Plaintiff had normal bilateral knee range of motion and stability, normal lower extremity strength and sensation, and a limping gait but a normal stance. The other medical evidence of record included repeated findings of normal gait and station and Plaintiff's reports of symptom improvement with medication and hyalgan injections. The ALJ noted that "no treating physician has provided opinion evidence regarding the severity and limiting effects of [Plaintiff's] impairments, and so Dr. Velez's opinion is particularly probative." (<u>Id.</u>) Accordingly, the ALJ was justified in giving great weight to most of Dr. Velez's opinions, and substantial evidence supports the ALJ's decision.

Dr. Velez opined that Plaintiff has no sitting, standing, walking, or squatting limitations so long as Plaintiff was not required to work or squat for more than two-thirds of the work day. Dr. Velez further opined that Plaintiff had no manipulative limitations or any written or communication problems but she might have difficulty with respect to hearing and understanding verbal instructions and interacting with others. The ALJ did not adopt Dr. Velez's opinion in full

because she restricted Plaintiff to sedentary[3] work by limiting Plaintiff to no more than two hours of standing or walking each work day, in fifteen-minute increments.

The ALJ explicitly departed from Dr. Velez's opinion regarding the functional impact of Plaintiff's hearing impairment by according that part of his opinion less weight. The ALJ explained that although Plaintiff exhibited decreased hearing at the consultative examination, the objective medical record does not contain any findings of impaired hearing or the need for repeated conversation. The ALJ opined that "the overall evidence supports a finding that her recurrent ear infections and associated hearing loss are non-severe impairments, because they do not satisfy the durational requirement." (Tr. 22) The ALJ also found that "the medical evidence does not show that [Plaintiff's ear infections and associated hearing loss] have had more than a minimal effect on [Plaintiff's] ability to perform any basic work activities..." and "her extensive treatment notes make no mention of any hearing deficient, difficulty hearing or understanding conversation, or needing conversation repeated at any time." (Tr. 23) The ALJ further noted there are no audiogram test results showing any specific or permanent hearing loss.

Accordingly, the ALJ was justified in giving less weight to Dr. Velez's opinion regarding Plaintiff's hearing impairment. See Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (finding error when the ALJ offered no basis to give an opinion non-substantial weight; "[f]or example, the ALJ did not find the opinion inconsistent with the record or another [of the physician's own] opinion[s]"). In the instant case, the ALJ explained her reasons for giving Dr. Velez's opinion as to Plaintiff's hearing impairment less weight as inconsistencies between the medical evidence of record. The ALJ is not required to cite specifically to the regulations but

---

[3] The regulations define sedentary work as that which involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Walking and standing are required only occasionally. See 20 C.F.R. § 404.1567(a).

need only clarify whether she discounted the opinion and why.  Kientzy v. Colvin, Cause No. 4:15 cv 707 JMB, 2016 WL 4011322, at *8 (E.D. Mo. July 27, 2016).

**B.**     **Subjective Complaints of Pain**

Plaintiff's contention that the ALJ failed to properly consider her subjective complaints of pain is without merit.  The ALJ properly discounted Plaintiff's subjective complaints of pain because they were inconsistent with the objective medical evidence and the absence of objective medical evidence supporting the degree of severity alleged.  The ALJ explained that, although the medical record establishes Plaintiff had multiple severe impairments, the objective medical record failed to support the allegedly disabling nature of Plaintiff's physical impairments.  The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…."  (Tr. 37)

Substantial evidence supports the ALJ's determination that Plaintiff's subjective complaints were not fully consistent with the evidence of record, and her conservative and beneficial treatment history was not consistent with a finding of greater functional limitations.  See Crawford v. Colvin, 809 F.3d 404, 410 (8th Cir. 2015) ("[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies….").  Although Plaintiff testified that she has difficulty with ambulation and can stand for less than on minute and walk for less than three minutes, the objective record showed Plaintiff walked without assistance with normal gait and station, examinations showed normal range of motion in her knees and legs, and treating doctors encouraged Plaintiff to exercise.  The ALJ noted that the objective medical record does not show that Plaintiff was prescribed a cane or other assistive device during the alleged period of disability, or ever advised to abstain from any activities because of her

impairments, but instead, treating doctors repeatedly advised Plaintiff to exercise.

There is substantial evidence to support the ALJ's broader conclusion that Plaintiff's treatment history was fairly conservative and beneficial treatment, indicating that her impairments were not as severe and limiting as alleged. (Tr. 37) The medical record showed that Plaintiff received regular treatment with her primary care physician, her pain management specialist, starting in December 2013, her cardiologist, starting in September 2014, and her podiatrist, starting in July 2015. The ALJ noted that Plaintiff never received referrals to an endocrinologist to manage her diabetes, or to an orthopedist to treat her musculoskeletal conditions. The record shows that Plaintiff's blood glucose levels improved after Plaintiff began insulin therapy and maintained compliance with a diabetic diet. The record also shows Plaintiff had been on the same pain management treatment regimen for knee pain from January 2014 until June 2016 and reported improved symptoms with medication and injection therapy. This pattern of minimal or conservative treatment weighs against allegations of disabling impairments. See Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015); Robinson v. Sullivan, 956 F.2d 936, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).

Moreover, although Plaintiff's alleged date of disability is August 31, 2011, a number of her disabling conditions, diabetes, hypertension, obesity, and her left knee impairment, preceded the date of disability, and the medical record did not show that these impairments had worsened. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("The fact that Goff worked with the impairments for over three years after her strokes, coupled with the absence of evidence of significant deterioration in her condition, demonstrate that the impairments are not disabling in the present."). The undersigned also notes that the record shows that in August 2011, Plaintiff reported opening a business. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) ("It was

also not unreasonable for the ALJ to note that [the plaintiff's] part-time work [was] inconsistent with her claim of disabling pain.").

Additionally, the ALJ was justified in discounting Plaintiff's complaints about her symptoms because two of her statements conflict with the medical records. See Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006). First, although Plaintiff claimed that she required the use of a cane and knee brace on a daily basis, her emergency room visits and treatment records do not show any treating doctors observed Plaintiff using any assistive device or recommended that she use any assistive device. Second, Plaintiff claimed to have difficulty getting up and down from a chair and the examination table at the consultative examination, but her treatment records do not have any objective observations of difficulty getting out of chairs and needing assistance to do so. The ALJ concluded that "the objective medical evidence is not fully consistent with the degree of symptoms and limitations alleged by [Plaintiff,] and therefore her allegations and testimony are not fully consistent with the evidence." (Tr. 37) Finally, the ALJ noted Plaintiff's history of noncompliance with her diabetic diet. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (unjustified failure to follow prescribed treatment is grounds for denying disability).

### C.    Residual Functional Capacity

 Plaintiff argues that the ALJ's RFC is not supported by substantial evidence by her failure to support her RFC findings with any medical evidence.

In assessing RFC, an ALJ must consider all of the relevant evidence, including "an individual's own description of [her] limitations." Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013). The ALJ must explain her assessment of the RFC with specific references to the record. SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and

nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion). Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). In determining a claimant's RFC, the ALJ must rely on some medical evidence of plaintiff's abilities, but need not rely on a specific medical opinion. Id.

The ALJ thoroughly discussed all of the medical evidence of record in support of Plaintiff's RFC. The ALJ specifically noted that, although the record shows some findings of antalgic gait without an any assistive device, the record documents numerous findings of normal gait and station and examinations showing normal lower extremity range of motion, strength, and sensation, with negative straight–leg raise testing and no instability, crepitus, stiffness, or effusion of the knee joints. The ALJ referenced Plaintiff's August 2014 consultative examination with Dr. Velez, whose findings on examination, included normal bilateral knee range of motion and stability, normal lower extremity strength and sensation, and limping gait but normal stance. These findings generally comported with the other medical evidence, and Plaintiff's reported symptom improvement on her medication regimen and hyalgan injections. Based on this examination, Dr. Velez opined that Plaintiff had no limitations with sitting, standing or walking, although she may have difficulties keeping up pace if asked to walk for more than two thirds at the time. Dr. Velez also opined that Plaintiff may have difficulty squatting but she had no manipulative limitations. Giving Dr. Velez's opinion great weight, the ALJ incorporated these functional limitations into the RFC assessment and imposed additional limitations. (Tr. 29)

As to Dr. Velez's opinion regarding Plaintiff's limitations in interacting with others, hearing, and understanding verbal instructions, the ALJ accorded less weight because the

objective medical records do not show any findings of the need for repeated conversation, and the medical evidence does not establish that Plaintiff's recurrent ear infections and hearing loss to be severe impairments, and there is no record showing audiogram test results showing specific or permanent hearing loss.

The ALJ also specifically discussed other physical examinations at which Plaintiff exhibited normal gait and station, normal bilateral knee range of motion and stability, and normal lower extremity strength and sensation. The ALJ further noted that there was no diagnostic imaging, showing any abnormalities of either knee or Plaintiff's lumbar spine.

Contrary to Plaintiff's assertion, the ALJ properly reviewed all the medical evidence of record, including treatment records that revealed no condition that would limit Plaintiff's ability to function in the workplace to a degree that would render her disabled. The ALJ thoroughly discussed specific medical evidence as well as the nonmedical evidence of record, addressed the consistency of this evidence when viewed in light of the record as a whole, and assessed Plaintiff's RFC based on the relevant, credible evidence of record. Accord SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec, Admin. July 2, 1996). No medical evidence in the record demonstrates that Plaintiff experienced limitations beyond those determined by the ALJ, and the ALJ properly discounted Plaintiff's subjective complaints of disabling limitations. McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011) (court reviews record to ensure that ALJ did not disregard evidence or ignore potential limitations).

Because the ALJ based her RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir, 2003).

## D.      **Third Party Statements**

Plaintiff argues that the ALJ improperly evaluated the third-party witness statements. This Court finds that the ALJ properly considered the statements and refused to accord controlling weight to them for acceptable reasons.

In addition to correctly noting that two of the third-party witnesses, Ms. Coleman and Mr. Owens, were not medically trained, and therefore did not have the expertise to make clinical determinations, the ALJ noted that they had a motivation as family members to help Plaintiff obtain her benefits.  See Choate, 457 F.3d at 872 ("Corroborating testimony of an individual living with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case.").  The ALJ also permissibly discounted their statements due to a lack of support in the record.  Ostronski v. Chater, 84 F.3d 413, 419 (8th Cir. 1996).  While they reported that Plaintiff required help getting up from chairs and with daily mobility, a review of the medical record reveals that Plaintiff did not report difficulty performing basic activities of daily living or getting out of chairs.  These lay opinions indicate greater functional limitations than Plaintiff had ever reported to her treating doctors and observed by her treating doctors.  See Buckner, 646 F.3d at 559-60 (same evidence that ALJ referred to in discrediting plaintiff's claims also discredited his girlfriend's statements).  Therefore, the undersigned finds that the ALJ properly discounted the third-party opinions and accorded them no significant weight.

In determining the weight to be given to Ms. Usher's opinion, the ALJ found that Ms. Usher was not an acceptable medical source and had offered only a lay opinion regarding Plaintiff's ability to function.  Moreover, the ALJ noted that Ms. Usher had not worked with Plaintiff since August 31, 2011, nor did she reference an ongoing relationship with Plaintiff since that time so the record was unclear whether her opinion was based on any regular interaction

with Plaintiff or direct knowledge of Plaintiff's daily activities. The ALJ found that the medical evidence does not support the extent of limitations set forth in Ms. Usher's statement. While Ms. Usher reported that Plaintiff required help getting up from chairs, the ALJ noted that Plaintiff's treating doctors had not observed such difficulty at appointments, and their treatment notes contained very few complaints of such limitation. The ALJ also found that "the overall evidence of record is consistent with Ms. Usher's opinion that [plaintiff] is limited in her ability to walk for long distances, as [plaintiff] has exhibited antalgic gait at times and has consistently reported difficulty with prolonged walking." (Tr. 35) The ALJ accorded Ms. Usher's statement partial weight.

As to the opinion of Ms. Waller, the ALJ found that Ms. Waller was not an acceptable medical source and had offered only a lay opinion. The ALJ noted that "[t]he overall medical evidence of record does not support the extent of symptoms and functional limitations reflected in Ms. Waller's opinion." (Tr. 36) The ALJ opined that Plaintiff had not reported having significant problems getting out of chairs or limitations in sitting to her treating doctors and her doctors had not observed such functional limitations. The ALJ noted that her treating doctors had not prescribed the use of an assistive device or observed Plaintiff using such device. The ALJ accorded Ms. Waller's opinion little weight.

The ALJ specifically addressed the third-party statements and gave her reasons for discounting them. While the ALJ is required to consider such third-party statements, she is not required to believe or fully credit them. See SSR 96-7.

## IX.   Conclusion

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole. See Finch, 547 F.3d at 935. Similarly, the Court

cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  <u>See</u> <u>Buckner</u>, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

<u>/s/ *John M. Bodenhausen*</u>
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of September, 2018.